**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| In Re the Personal Restraint of: | No.  54813-5-II |
| DANIEL GALEANA RAMIREZ, | |
| Petitioner. | UNPUBLISHED  OPINION |

WORSWICK, J. — Daniel Galeana Ramirez seeks relief from personal restraint imposed as a result of his 2016 convictions for two counts of first degree assault while armed with a firearm. He argues (1) that the trial court erred when it admitted speculative testimony, (2) that he was denied a fair trial because police interviewed a Spanish-speaking victim without using a certified interpreter, (3) that he was denied due process when the trial court allowed the State to ask a compound question to the jury venire during voir dire, (4) that he was denied due process and a fair trial when the trial court sentenced him to a higher sentence than the State recommended, and (5) cumulative error denied him of a fair trial.  We deny Galeana Ramirez's petition.

FACTS

I.  BACKGROUND AND PRETRIAL PROCEDURE

A.  *October 2014 Robbery and Assault*

Galeana Ramirez filed this petition to seek relief from a 2016 conviction that arises out of two related incidents that occurred in October 2015.  *State v. Ramirez*, 7 Wn. App. 2d 277, 280, 432 P.3d 454 (published in part), *review denied*, 193 Wn.2d 1025, 445 P.3d 567 (2019).  We previously decided Galeana Ramirez's direct appeal, along with those of his codefendants, Alejandro Ramirez and Steven Nicolas Russell, in January 2019.  *Ramirez*, 7 Wn. App. 2d at 280.  We set forth the relevant factual background in that opinion:

Jose Leiva-Aldana and Agustin Morales-Gamez were walking home on the night of October 24, when they were accosted by two men. The men demanded money, tried to take Leiva-Aldana's wallet and took Morales-Gamez's cell phone. The men, later identified as [Alejandro] Ramirez and Russell, physically assaulted Leiva-Aldana and Morales-Gamez; during the assault, Morales-Gamez was hit in the head with a hard metal object.[1] Morales-Gamez fought back with a small knife and the attackers fled. Leiva-Aldana and Morales-Gamez reported the incident to the police.

After reporting the incident to police, Leiva-Aldana and Morales-Gamez walked home in the early morning hours of October 25. As they approached their home, they were again accosted and assaulted by two men, later identified as Russell and [Daniel] Galeana Ramirez. During this second assault, the attackers shot Leiva-Aldana in the stomach and shrapnel from a bullet hit Morales-Gamez in the foot.

Officers discovered a cell phone at the scene of the October 24 robbery incident. Detective Dave Cox sent the cell phone to the Computer Crime Institute at Dixie State University in order for them to perform a "chip-off" procedure. Verbatim Report of Proceedings (VRP) (June 30, 2016) at 19. Chip-off forensics is a high-tech method of extracting and analyzing data stored on flash memory chips. This method often allows the extraction of data from devices even if the device is damaged or the data has been deleted. See VRP (June 30, 2016) at 26. Detective Cox later received the cell phone back with hundreds of pages of data extracted from the cell phone.

. . .

. . . Based solely on the October 25 incident, the State charged Galeana Ramirez with first degree assault of Leiva-Aldana (count I) and first degree assault of Morales-Gamez (count II).

*Ramirez*, 7 Wn. App. 2d at 280-81. The State also charged Russell and Ramirez with multiple

crimes. *Ramirez*, 7 Wn. App. 2d at 281.

B. *Joinder and Transportation*

Before trial, the State moved to join Russell's, Ramirez's, and Galeana Ramirez's cases. The trial court granted the motion and ordered the cases joined for trial over defense counsels' objections. Subsequently, each appellant filed motions to sever which the trial court denied.

---

[1] To avoid confusion, we follow our convention on direct appeal and refer to the petitioner here, Daniel Galeana Ramirez, as "Galeana Ramirez," and Alejandro Ramirez as "Ramirez."

Prior to voir dire, Galeana Ramirez's counsel expressed concern about how the defendants were being brought into the courtroom. Counsel stated that while the defendants were obviously in custody and being guarded by jail staff, they were brought down a hallway past the room where jurors were sitting. The trial court responded that counsel could ask about this during voir dire and declined the request to start the trial on another day. Despite the trial court's invitation, none of the defense counsel questioned the jury panel about this issue.

*Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 10
https://www.courts.wa.gov/opinions/pdf/D2%2049245-8-II%20Published%20Opinion.pdf.[2]

C. *Pretrial Motion to Admit Cell Phone Testing Results*

Before trial, the parties learned that William Matthews, the technician who performed the chip-off data extraction from the cell phone found at the scene of the robbery, could not be located for trial. The State sought to admit the data extraction results by laying a foundation with Joan Runs Through, the assistant director of the Computer Crime Institute.

At the hearing on this matter, Runs Through admitted that she did not extract the data and that her testimony relied entirely on the report of testing done by Matthews. Runs Through testified generally about the type of data Matthews could have extracted from the cell phone, which included text and short message service messages, pictures, Internet activity, and calendar information. Runs Through also testified that she was familiar with the chip-off process and that she had taught the process to other technicians at the university. Specifically, she testified that there is nothing that a technician or an examiner can do to change data on the chip. Runs Through further testified that she looked through the extracted cell phone information and that the process had worked correctly.

Defense counsel objected to Runs Through's testimony and argued that the cell phone evidence should be excluded unless Matthews testified. The trial court disagreed and ruled that Runs Through could testify about the chip-off process.

*Ramirez*, 7 Wn. App. 2d at 281-82.

---

[2] The unpublished portion of the case is cited here for its recitation of the facts, not for its precedential value.

3

D.      *Jury Venire Voir Dire*

During voir dire of the jury venire, the State asked prospective jurors questions about

whether the prospective jurors had been victims of a crime and whether it would affect their

ability to be impartial decision-makers.  The State first questioned the jury venire generally if

anyone had been a victim of a crime, before turning to individual prospective jurors to ask

questions.

The State asked five different prospective jurors, who had identified themselves as

victims, to generally describe the crime, how long ago it had been, and whether it would be

difficult for them to sit as jurors.  After questioning the initial five, the State asked the jury venire

generally if any of them had been a victim of a crime:

> [PROSECUTOR]: Anybody here—a lot of people answered yes to that question so
> I'm just going to throw it out to anybody here who has been a victim of a crime, is
> there anything about that experience, is the wound too raw?
>
> Is there something about that experience that makes you think, 'Hey, I don't
> know if I can sit on this jury and be fair?'  Ma'am, what's your number?
>
> PROSPECTIVE JUROR: 83.
>
> [PROSECUTOR]: 83.  And may I inquire what happened to you ma'am?
>
> PROSPECTIVE JUROR: Violence.
>
> [PROSECUTOR]: Okay.  And is that something fairly recent?
>
> PROSPECTIVE JUROR: Yes.
>
> [PROSECUTOR]: All right.  And, you know, I don't want to get into your private
> affairs, understandably this is something that has affected you.  You're telling me
> that this is going–if you were selected to sit on this jury, that you could not put what
> happened to you to one side, is that what you're saying?
>
> PROSPECTIVE JUROR: Yes.

2 VRP (June 28, 2016) at 69-70. The trial court then excused prospective juror 83 for cause without objection.

## II. TRIAL

The case proceeded to joint trial of Galeana Ramirez, Ramirez, and Russell. The victims, police officers, and Runs Through all testified. We summarized their testimony on direct appeal.

A.      *Cell Phone Analysis*

> At trial, Runs Through testified extensively about the chip-off process and the preparation of the resulting report. She did not testify about the contents of the cell phone found at the scene of the robbery. The trial court admitted portions of the report. Based on the report exhibits, Detective Cox testified about the data extracted from the phone that allowed him to connect the cell phone to Russell and then to connect Russell to Ramirez. Detective Cox also testified that the data extracted from the cell phone included text messages from Russell to Ramirez inviting Ramirez to go out for a beer at 7:00 pm on the night of October 24.

*Ramirez*, 7 Wn. App. 2d at 282.

B.      *October 24 Incident*

At trial, the jury heard the following evidence related to the October 24 incident.

> On October 24, 2015, Morales-Gamez and Leiva-Aldana were walking home when they were attacked from behind in an alley near their home. The event was captured by [nearby] video cameras.

> Morales-Gamez testified that when the men attacked them 'they were yelling and they wanted [Morales-Gamez and Leiva-Aldana] to give them the wallet, [their] money.' VRP (June 29, 2016) at 92. The men hit Morales-Gamez in the head with something metal and he fell to the ground. Morales-Gamez also testified that the men took his cell phone. Morales-Gamez defended himself with a knife during the incident. After the attack, Morales-Gamez asked a nearby woman who witnessed the incident to call the police.

*Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 10-11. Leiva-Aldana's testimony and that of two witnesses corroborated Morales-Gamez's account. *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 11-12.

> Detective Jason Perkinson testified that on October 24, he was working security at Grays Harbor Community Hospital. While working, he saw two men, later identified as Russell and Ramirez, come into the emergency room. Detective Perkinson later found out that the two men were at the hospital because Ramirez had been stabbed.

*Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 12-13. Later that same night, Russell came to Ramirez's hospital room with Galeana Ramirez. *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 13. Russell and Galeana Ramirez left the hospital around 2:00 AM on the morning of October 25. *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 13.

C.     *October 25 Incident*

> Morales-Gamez testified that after the initial attack near their home, he and Leiva-Aldana went to the police station to give statements about the incident. Leiva-Aldana and Morales-Gamez left the police station around 2:00 AM on October 25. Morales-Gamez testified that as he and Leiva-Aldana again approached their home, two men, later identified as Russell and Galeana Ramirez, were waiting for them and that one of them shot Leiva-Aldana. Morales-Gamez testified that some shrapnel also hit him in the foot.

> Leiva-Aldana testified that during the second confrontation, Galeana Ramirez shot him 'in the stomach.' VRP (June 30, 2016) at 102-04. Leiva-Aldana was taken to the hospital for his gunshot wound. . . .

>      . . .

> Officer Monte Glaser testified that Leiva-Aldana suffered a 'through and through [gunshot] wound' to his upper left abdomen. VRP (July 1, 2016) at 228.

*Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 13-14.

Detective Cox also testified that when he went to the hospital at 8:30 AM on October 25, he presented Leiva-Aldana with a photo line-up. Detective Cox admitted he did not speak any Spanish and communicated with Leiva-Aldana through a staff member at the hospital who spoke Spanish. Detective Cox testified that from the stack of six photographs he gave Leiva-Aldana, Leiva-Aldana set aside the first two photos, stopped at the third, scanned the fourth through sixth

6

photos, then returned to the third and pointed to it. Detective Cox then asked Leiva-Aldana to sign the third photograph, which depicted Galeana Ramirez.

Police Officer Robert Green, one of the officers involved in Galeana Ramirez's arrest, also testified. He testified that early on the morning of October 25, he observed Galeana Ramirez leave the hospital with Ramirez in a white car. Officer Green then testified that he saw the same white car later in the day on the 25th and called other officers to the location: a house where officers arrested Galeana Ramirez. When the State asked Officer Green why police were looking for Galeana Ramirez, Green testified, "Daniel Galeana Ramirez was—we were advised he had—we had probable cause for his arrest for the shooting." 2 VRP (July 1, 2016) at 265.

Two weeks after the incidents, Police Officer Jason Capps retrieved a .38 caliber revolver from Josiah Rhodes. Officer Capps testified that the surrender of the firearm resulted in a criminal investigation of a Rigo Rivera and his being charged with unlawful possession of a firearm. Detective Cox found out about the firearm and had it sent for examination by the crime lab along with a bullet that Cox had retrieved from the shooting scene. Detective Cox testified that he investigated the firearm as possibly being connected to Galeana Ramirez because Rivera and Galeana Ramirez "kn[ew] each other." 3 VRP (July 6, 2016) at 493-96. A forensic scientist with the Washington State Patrol testified that he test-fired the firearm and the test-bullet matched the one recovered from the October 25 shooting scene.

D.    *Jury Verdicts, Sentencing, and Direct Appeal*

The jury found Galeana Ramirez guilty of two counts of first degree assault. The jury also found that he was armed with a firearm when he committed the crimes. The State

recommended a standard range sentence of 176 months for each count, to be served consecutively.

At the sentencing hearing, the trial court made only brief comments, stating that Galeana Ramirez showed "no remorse" and was a "blank slate. . . . [S]tone cold." 4 VRP at 759-60. The trial court then sentenced Galeana Ramirez to the recommended sentence of 176 months for each count.

Galeana Ramirez and his codefendants filed a direct appeal. *Ramirez*, 7 Wn. App. 2d at 282. We affirmed Galeana Ramirez's convictions, resolving multiple arguments on their merits. *Ramirez*, 7 Wn. App. 2d at 286. We held that (1) the State proved that the shooting victim suffered great bodily harm, *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 29, (2) Galeana Ramirez did not show that joinder deprived him of a fair trial and that any potential prejudice was outweighed by judicial economy, *Id.* at 21, (3) Galeana Ramirez's trial counsel was not deficient, *Id.* at 32, (4) Galeana Ramirez's confrontation rights were not violated, *Ramirez*, 7 Wn. App. 2d at 285-86, and (5) there was insufficient evidence to show that a jury saw Galeana Ramirez in restraints, *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 37.

Galeana Ramirez now files this personal restraint petition (PRP).

ANALYSIS

Of Galeana Ramirez's ten arguments in his PRP, we previously decided five on direct appeal, and we do not consider those arguments again here. Galeana Ramirez additionally argues that the trial court erred when it admitted testimony about the firearm; that he was denied a fair trial because police interviewed a Spanish-speaking victim without using a certified interpreter; that he was denied due process when the trial court allowed the State to ask a

compound question to the jury venire during voir dire; and when the trial court sentenced him to a higher sentence than the State recommended. He also argues cumulative error denied him a fair trial. But Galeana Ramirez fails to make an adequate showing of error or cite to applicable authority that would entitle him to relief. Thus, Galeana Ramirez's arguments are either barred or they fail.

## I. STANDARD OF REVIEW

"To succeed on a PRP, the petitioner must prove unlawful restraint." *In re Pers. Restraint of Dyer*, 175 Wn.2d 186, 195, 283 P.3d 1103 (2012) (*Dyer* III). Restraint is unlawful when "the sentence . . . was imposed or entered in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(2).

### A. *Procedural Requirements for Review*

"The petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)) (internal quotation marks omitted). A petitioner can overcome this prohibition "in the 'interests of justice'" only if "[m]aterial facts exist which have not been previously presented and heard" or "[t]here has been a significant change in the law, whether substantive or procedural, which is material to the conviction, sentence, or other order entered in a criminal proceeding." *In re Pers. Restraint of Copland*, 176 Wn. App. 432, 437, 309 P.3d 626 (2013); RAP 16.4(c)(3)-(4); *see also Sanders v. United States*, 373 U.S. 1, 16-17, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963) (holding that in motions for a writ of habeas corpus, where a petitioner argues on grounds previously heard and determined, "the

applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application"). A petitioner does not create a new issue merely by supporting previous grounds for relief with different factual allegations or legal arguments. *Davis*, 152 Wn.2d at 671.

The interests of finality of litigation demand a high standard be satisfied in a collateral proceeding. *Davis*, 152 Wn.2d at 672. Accordingly, the standards of review for constitutional and nonconstitutional issues are different. *Davis*, 152 Wn.2d at 672. To obtain relief in a constitutional challenge, Galeana Ramirez must show "that he was actually and substantially prejudiced by a violation of his constitutional rights." *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). Galeana Ramirez must show that the constitutional error has actually prejudiced him by a preponderance of the evidence. *Lord*, 152 Wn.2d at 188; *Davis*, 152 Wn.2d at 671-72.

Nonconstitutional error requires a showing of more than mere prejudice. *Davis*, 152 Wn.2d at 672. To be entitled to full collateral review, the nonconstitutional error must constitute a "'fundamental defect which inherently results in a complete miscarriage of justice.'" *Davis*, 152 Wn.2d at 672 (quoting *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990)).

B.    *Available Relief*

When considering a PRP, we may (1) deny the petition, (2) grant the petition, or (3) transfer the petition to superior court for a determination on the merits or a reference hearing. *State v. K.A.B.*, 14 Wn. App. 2d 677, 704–05, 475 P.3d 216 (2020); *see also* RAP 16.11(b). We dismiss PRPs where the petitioner fails to make a prima facie showing of actual prejudice for

constitutional errors or a complete miscarriage of justice for nonconstitutional errors. *Yates*, 177

Wn.2d at 17-18. To make such a showing, the petitioner must offer facts to support the claim of

unlawful restraint and evidence to support those factual allegations. *Yates*, 177 Wn.2d at 18.

## II. ISSUES DECIDED ON DIRECT APPEAL

We previously decided many of Galeana Ramirez's arguments on the merits on direct

appeal. He fails to show that the interests of justice require us to review these issues. [3]

First, Galeana Ramirez argues that there was insufficient evidence to support the finding

by a rational trier of fact that he caused "great bodily harm" to Leiva-Aldana, who Galeana

Ramirez shot in the abdomen. Br. of Petitioner at 11-14. Next, Galeana Ramirez argues that his

right to a fair trial was prejudiced when his case was joined with that of his codefendants for

trial. He argues that he received ineffective assistance of counsel because his trial counsel failed

to object to Officer Greene's testimony that he had probable cause to arrest Galeana Ramirez,

and that his right to confront witnesses against him was denied when the court admitted the cell

phone "chip-off" testing evidence when testimony on the results was given by someone other

than the individual who did the testing. Br. of Petitioner at 22. Finally, he argues that he was

denied his right to a fair trial when he was escorted to the courtroom by correctional staff past a

room where jurors were sitting.

---

[3] Galeana Ramirez argues for the first time in his reply brief that we should reach issues that we decided and rejected on direct appeal because the interests of justice so require. Citing *Yates*, Galeana Ramirez summarizes his argument in one conclusory sentence without elaboration. Even assuming we would consider arguments raised for the first time in a reply brief, "'[b]ald assertions and conclusory allegations' are insufficient to justify a reference hearing." *Yates*, 177 Wn.2d at 18 (quoting *In Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)). Thus, his argument fails.

No. 54813-5-II

As explained above, petitioner does not create a new issue merely by supporting previous grounds for relief with different factual allegations or legal arguments. *Davis*, 152 Wn.2d at 671. Galeana Ramirez's arguments in his PRP and in his reply brief are attempts to relitigate the determinations we made on direct appeal. *See Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 20-24, 30-32, 37-38; *Ramirez*, 7 Wn. App. 2d at 283. Accordingly, because these arguments in Galeana Ramirez's PRP are the same as those argued on direct appeal, these arguments are procedurally barred. Thus, we do not reach the merits of these arguments.

### III. DETECTIVE COX'S TESTIMONY

Galeana Ramirez argues that his right to a fair trial was prejudiced when the trial court allowed Detective Cox to "speculate" that the firearm recovered by Officer Capps was the one used in the shooting. Br. of Petitioner at 18. The State argues that this argument is procedurally barred because it was already litigated on direct appeal. We reach the merits, but hold that Galeana Ramirez's argument fails.

As an initial matter, Galeana Ramirez argued on direct appeal that the trial court erred when it admitted Detective Cox's testimony regarding the firearm. *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 30. However, on direct appeal we held that Galeana Ramirez waived the issue under RAP 2.5. *Ramirez*, No. 49245-8-II, slip op. (unpublished portion) at 30 (citing *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006)).

A petitioner is barred from renewing in a PRP a claim he or she argued on direct appeal only if the issue was fully litigated on the merits and disposed of on direct appeal. *See In re Pers. Restraint of Knight*, 196 Wn.2d 330, 341, 473 P.3d 663 (2020). Because on direct appeal

12

we disposed of Galeana Ramirez's argument under RAP 2.5, we did not reach the merits. Accordingly, Galeana Ramirez is not barred under *Yates* from relitigating that issue here.

Turning to the merits, Galeana Ramirez argues that the trial court erred when it allowed Detective Cox to "speculate" that there was a connection between him and the firearm, based on the detective's testimony that the prior possessor of the weapon and Galeana Ramirez "kn[ew] each other." Br. of Petitioner at 18-19. We disagree.

Assuming without deciding that Galeana Ramirez raises a constitutional challenge, he must further show "that he was actually and substantially prejudiced by a violation of his constitutional rights." *Lord*, 152 Wn.2d at 188. He must show this prejudice by a preponderance of the evidence. *Lord*, 152 Wn.2d at 188. But Galeana Ramirez makes no such showing.

Instead, Galeana Ramirez reasserts his argument that the trial court erred by admitting a speculative statement but makes no showing that Detective Cox's testimony was speculative. Moreover, there is nothing in the record on appeal to support that Detective Cox's testimony was speculative. Galeana Ramirez asserts this testimony prejudiced him without explaining what the prejudice is, making only the conclusory argument that he was deprived of due process and a fair trial. Br. Petitioner at 19. But Detective Cox's testimony was not critical to connecting Galeana Ramirez to the firearm, and therefore he cannot show he was more likely than not prejudiced by the testimony.

Leiva-Aldana was shot. *Ramirez*, 7 Wn. App. 2d at 280. Leiva-Aldana identified Galeana Ramirez as one of his attackers. Police recovered a .38 caliber bullet from the scene of the crime. A Washington State Patrol forensic scientist testified that the recovered bullet was fired from the recovered firearm. Thus, the firearm was linked to Galeana Ramirez regardless of

Detective Cox's testimony.  Accordingly, we hold that Galeana Ramirez fails to show that he was substantially prejudiced by a preponderance of the evidence.

IV.  POLICE INVESTIGATION INTERPRETER

Galeana Ramirez argues that he was denied his right to due process and a fair trial when the investigating detective presented a photo montage to a victim who does not speak English without a certified interpreter.  He further argues that we should expand on our holding in *State v. Gonzales-Hernandez*, 122 Wn. App. 53, 92 P.3d 789 (2004),[4] and adopt a rule requiring certified interpreters at "all stages of a criminal investigation" to "ensure due process."  Reply Br. of Petitioner at 17-18.  We disagree and decline to adopt such a rule.

Although Galeana Ramirez frames his argument in constitutional terms, he makes no showing of how his constitutional rights were violated during Detective Cox's interview with Leiva-Aldana.  Accordingly, we treat this argument as a nonconstitutional assignment of error. Under that standard, Galeana Ramirez must show that the claimed error "'constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Davis*, 152 Wn.2d at 672 (quoting *Cook*, 114 Wn.2d at 813).  He fails to do so.

No statute or case law requires police officers to use a certified interpreter when interviewing a victim or witness.  Statutes and rules regarding certified interpreters are specific to court proceedings and criminal defendants.  More importantly, there is no evidence that admission of the photo montage interfered with any of Galeana Ramirez's rights, let alone led to

---

[4] There, we held that the trial court erred when it admitted a detective's testimony that the defendant said he was "sorry" during an interview with an uncertified interpreter.  *Gonzales-Hernandez*, 122 Wn. App. at 55, 59-60.

a complete miscarriage of justice. Leiva-Aldana testified at trial and identified Galeana Ramirez as one of the perpetrators.

Galeana Ramirez's reliance on *Gonzales-Hernandez*, 122 Wn. App. 53, is inapt. In *Gonzales-Hernandez*, two police officers questioned a Spanish-speaking suspect about alleged child abuse. 122 Wn. App. at 56. The officers had some working knowledge of Spanish but were not certified interpreters. *Gonzales-Hernandez*, 122 Wn. App. at 56. The officers testified that they questioned the defendant in Spanish, but used English words when they did not know the Spanish word. *Gonzales-Hernandez*, 122 Wn. App. at 56. From this, the officers formulated what amounted to a confession, with the Spanish-speaking defendant having used the English words for "sorry" and "rape." *Gonzales-Hernandez*, 122 Wn. App. at 56-57. We reversed Gonzales-Hernandez's conviction based on hearsay and held that testimony relating the implied confession based on the officers' mixing of English and Spanish was not harmless error. 122 Wn. App. at 59-60.

Galeana Ramirez interprets *Gonzales-Hernandez* to mean that certified interpreters are required when interviewing a suspect. But he is mistaken. We based our holding in *Gonzales-Hernandez* on the rule that a witness cannot testify about statements made by a defendant through an interpreter absent some exception to the hearsay rule. Here, Detective Cox testified about statements made to him by an interpreter. Galeana Ramirez did not object at trial to this hearsay testimony, and makes no argument based on hearsay here. Nonetheless, even assuming error, Galeana Ramirez has made no showing of any miscarriage of justice. As stated above, Leiva-Aldana identified Galeana Ramirez at trial as a perpetrator.

No Washington law mandates that police interview witnesses using a certified interpreter.[5] We hold that Galeana Ramirez does not show that the use of an uncertified interpreter here was a fundamental defect which resulted in a complete miscarriage of justice.

## V. VOIR DIRE AND COMPOUND QUESTIONS

Galeana Ramirez argues that he was denied his right to due process and a fair trial when the State asked the jury venire a compound question during voir dire. He argues that we should adopt a standard from Maryland that prohibits using a compound question when inquiring of a jury venire whether they have strong feelings about the crime at issue. *See Collins v. State*, 463 Md. 372, 205 A.3d 1012 (2019). We disagree and decline to adopt the Maryland rule.

Although Galeana Ramirez couches his argument in constitutional terms, he again makes no showing that his constitutional rights were violated. Instead, he relies only on Maryland law. Thus, Galeana Ramirez must show a fundamental error resulting in a complete miscarriage of justice. *Davis*, 152 Wn.2d at 672. He cannot. There is no Washington law or trial court rule that prohibits a trial court from asking compound questions during voir dire. Moreover, Galeana Ramirez misstates the Maryland rule.

In Maryland, a trial court may permit the parties to conduct voir dire, or the trial court judge may conduct the examination of the jury venire and pose questions proposed by the

---

[5] Requiring law enforcement to use certified interpreters at all stages of investigation or in all law enforcement scenarios would be problematic, especially in exigent circumstances. For example, as the State explained in oral argument, the Grays Harbor police department employs several officers whose first language is not English. Public policy does not support placing restrictions on officers whose first language is not English from speaking with victims and other witnesses who share a first language—especially in law enforcement settings where officers are required to react quickly.

parties. Maryland Rule 4-312(e)(1).[6] Under Maryland precedent, on request of one party, a trial court *must* ask the jury venire: "'Do any of you have strong feelings about [the crime with which the defendant is charged]?'" *Collins*, 463 Md. at 396 (quoting *Pearson v. State*, 437 Md. 350, 354, 86 A.3d 1232 (2014)). Under procedure particular to Maryland, the trial court judge must ask a "strong feelings" question when requested by one of the parties, but need not necessarily ask follow-on questions. *See Collins*, 463 Md. at 394-95. Thus, Maryland courts have held that asking any compound form of the "strong feelings" question is an abuse of the trial court's discretion because it impermissibly shifts the responsibility to decide whether a juror is biased from the trial court to the prospective juror. *Collins*, 463 Md. at 394, 396-97; *Pearson*, 437 Md. at 362.

Washington has no analogous rule and the Maryland rule is wholly inapplicable to Washington procedure, let alone the facts here. The record on appeal shows that the State asked multiple potential jurors questions about whether they were victims of crimes, then opened the question up to the jury venire generally, stating:

> Anybody here—a lot of people answered yes to that question so I'm just going to throw it out to anybody here who has been a victim of a crime, is there anything about that experience, is the wound too raw?

---

[6] Md. Rule 4-312(e)(1) provides:

> *Examination*. The trial judge may permit the parties to conduct an examination of qualified jurors or may conduct the examination after considering questions proposed by the parties. If the judge conducts the examination, the judge may permit the parties to supplement the examination by further inquiry or may submit to the jurors additional questions proposed by the parties. The jurors' responses to any examination shall be under oath. On request of any party, the judge shall direct the clerk to call the roll of the array and to request each qualified juror to stand and be identified when called.

Is there something about that experience that makes you think, 'Hey, I don't know if I can sit on this jury and be fair?'

2 VRP (June 28, 2016) at 69. One juror raised her hand and the State asked follow-up questions. 2 VRP (June 28, 2016) at 69-70.

Furthermore, it is clear from the context of the State's voir dire questions that the State was asking jurors who were victims of crimes to describe whether those experiences might be problematic so that the trial court and trial counsel could determine bias. *See* 2 VRP (June 28, 2016) at 65-70. Contrary to Galeana Ramirez's argument, defense counsel easily could have followed up on the State's line of questioning. But Galeana Ramirez did not follow up or even object to the line of questioning. We decline to adopt the Maryland rule on compound questions, and we hold that Ramirez fails to show a fundamental error resulting in a complete miscarriage of justice.

## VI. STANDARD RANGE SENTENCE

Galeana Ramirez argues that he was denied his right to due process and a fair trial when the trial court sentenced him to more than the prosecutor recommended.[7] He further appears to argue that the trial court sentenced him to an exceptional sentence because of "'aggravating circumstances.'" Reply Br. of Petitioner at 20 (quoting Br. of Resp't at 41). We disagree for several reasons.

---

[7] Because he does not cite to the record, it is unclear from Galeana Ramirez's petition if or when the State recommended a lesser sentence than what the trial court adopted. To the extent that he argues that his resulting sentence is harsher than that offered in a plea deal, his argument fails for two reasons. First, the record on appeal contains no information on abandoned plea agreements. Second, the statute is clear: "The sentencing judge is not bound by any recommendations contained in an allowed plea agreement and the defendant shall be so informed at the time of plea." RCW 9.94A.431(2).

No. 54813-5-II

First, Galeana Ramirez misstates the record. Galeana Ramirez bases his argument on the statement that the State "recommended that Mr. Galeana Ramirez be sentenced to the bottom of the sentencing range." Br. of Petitioner at 35. This is false. The lowest sentence available in the statutory range was 153 months for each count. The State recommended a standard range sentence of 176 months for each count.

Second, the trial court sentenced Galeana Ramirez to a standard range sentence, not an exceptional sentence. Under RCW 9.94A.030(46)(v), assault in the first degree is a "serious violent offense." Under RCW 9.94A.589(1)(a), Galeana Ramirez's two convictions for assault in the first degree are separate criminal conduct because they do not involve the same victim.[8] Accordingly, the sentences for his convictions "shall be served consecutively."[9] RCW

---

[8] RCW 9.94A.589(1)(a) reads, in pertinent part:

[W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . 'Same criminal conduct,' as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

[9] RCW 9.94A.589(1)(b) reads, in pertinent part:

Whenever a person is convicted of two or more serious violent offenses arising from separate and distinct criminal conduct, the standard sentence range for the offense with the highest seriousness level under RCW 9.94A.515 shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score and the standard sentence range for other serious violent offenses shall be determined by using an offender score of zero. . . . All sentences imposed under this subsection (1)(b) shall be served consecutively to each other and concurrently with sentences imposed under (a) of this subsection.

19

9.94A.589(1)(b). Under RCW 9.94A.515, "Assault 1" has a seriousness level of XII. On the sentencing grid, RCW 9.94A.510, Galeana Ramirez's offender score of 0 and seriousness level of XII correlate to a standard range sentence of 93-123 months for each count.

The jury also found that Galeana Ramirez used a firearm in the commission of his crimes. Accordingly, under RCW 9.94A.533(3)(a), 60 months is added to this standard range. This results in a total standard range for each count of 153 to 183 months. The trial court sentenced Galeana Ramirez to the recommended 176 months on each count, for a total of 352 months confinement. Thus, contrary to Galeana Ramirez's argument, his sentence is properly within the standard range.[10]

Third, because the trial court sentenced Galeana Ramirez to a standard range sentence, he may not appeal his sentence absent the trial court failing to comply with constitutional requirements or the procedural requirements of the Sentencing Reform Act (SRA).[11] *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006). Galeana Ramirez makes no attempt to meet this requirement.

> A sentence within the standard sentence range, under RCW 9.94A.510 or 9.94A.517, for an offense shall not be appealed. For purposes of this section, a sentence imposed on a first-time offender under RCW 9.94A.650 shall also be deemed to be within the standard sentence range for the offense and shall not be appealed.

RCW 9.94A.585(1).

---

[10] Nor is it at "the top" of the sentencing range, as Galeana Ramirez contends. Br. of Petitioner at 35.

[11] Chapter 9.94A RCW.

The record simply does not support Galeana Ramirez's contention that the trial court gave an exceptional sentence, nor does the record on appeal show any "aggravating circumstances." Indeed, Galeana Ramirez fails to show that the trial court erred either constitutionally or procedurally under the SRA. Without making any showing, Galeana Ramirez asks us to infer that the trial court was imposing a "trial tax" on him for going to trial— apparently as punishment for not taking a plea deal. Br. of Petitioner at 35; Reply Br. of Petitioner at 20-21. But he cites no law and nothing in the record on appeal supports this argument. We decline to make that inference. Thus, under RCW 9.94A.585(1), Galeana Ramirez may not appeal his standard range sentence. Accordingly, we hold that the trial court properly sentenced Galeana Ramirez to a standard range sentence.

## VII. CUMULATIVE ERROR

Finally, Galeana Ramirez argues that cumulative errors resulted in an unfair trial that violated his due process rights. We disagree.

The cumulative error doctrine applies when a trial is affected by several errors that standing alone may not be sufficient to justify reversal but, when combined may deny a defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). To determine whether cumulative error requires reversal of a defendant's conviction, we must consider whether the totality of circumstances substantially prejudiced the defendant. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). The cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

No. 54813-5-II

Here, we previously considered the errors Galeana Ramirez alleges and do not reconsider them here. To the extent Galeana Ramirez alleges errors in his new arguments, he fails to show any prejudice. Thus, this claim fails.

CONCLUSION

We deny Galeana Ramirez's petition. Five of his arguments are procedurally barred because the issues were decided on direct appeal. Regarding the remaining arguments, we hold that Galeana Ramirez fails to show that he was substantially prejudiced by Detective Cox's testimony about the firearm. We hold that Galeana Ramirez fails to show that testimony regarding a victim who had been interviewed through an interpreter and the trial court's voir dire were fundamental defects which inherently resulted in a miscarriage of justice. Likewise, we hold that the trial court properly sentenced Galeana Ramirez to a standard range sentence. We further hold that there was no cumulative error. Thus, we deny Galeana Ramirez's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Glasgow, A.C.J.

Veljacic, J.

22